IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL L. DUNN, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-12 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Daniel L. Dunn, Jr., seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 401-433.[1]  Presently before the Court are the parties'
cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.
For the reasons set forth below, Plaintiff's motion for summary
judgment will be denied and the Commissioner's cross-motion for
summary judgment will be granted.

---

[1]Title II of the Social Security Act provides for payment of
insurance benefits to disabled workers who have contributed to
the Social Security Program.  Plaintiff's earnings record shows
that he has acquired sufficient quarters of coverage to remain
insured for purposes of eligibility for DIB through December 31,
2007.  (R. 12).

1

## II. Background

### A. Procedural History

Plaintiff filed an application for DIB on March 2, 2004, alleging disability since September 26, 2002 due to "back problems."[2]  (R. 54-56, 63).  Plaintiff's application was denied initially and upon reconsideration.  (R. 29-30, 39-42).  On September 21, 2004, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  At the hearing, which was held on June 21, 2006, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.  (R. 43-44, 608-29).

On August 25, 2006, the ALJ issued a decision denying plaintiff's application for DIB.  (R. 12-20).  Specifically, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a range of sedentary work existing in

---

[2]As to the alleged onset date of Plaintiff's disability of September 26, 2002, the Court notes an inconsistency in the administrative record relating to the onset date.  Specifically, a record of Plaintiff's visit to the Emergency Department of Hamot Medical Center on July 1, 2004, indicates that Plaintiff reported his date last worked as September 26, 2003.  (R. 156). Similarly, the report of Plaintiff's neurosurgical evaluation by Dr. Matt El-Kadi on March 24, 2005, indicates that Plaintiff reported his date last worked as September 26, 2003.  (R. 283).

2

significant numbers in the national economy.[3]  Therefore, he was
not disabled under the Social Security Act.  (R. 19-20).

On September 22, 2006, plaintiff requested review of the
ALJ's decision.  (R. 9).  However, the request was denied by the
Appeals Council on January 5, 2007.  (R. 5-7).  This appeal
followed.

## B. Factual Background

Plaintiff's date of birth is March 5, 1972,[4] and he is a
high school graduate.  (R. 612).  At the time of the hearing
before the ALJ, Plaintiff had resided with his fiancé for 18
years, and they had 11 children.[5]  (R. 620).  In the past,
Plaintiff has worked as an accounts manager, a member of the

---

[3]RFC is the most a disability claimant can still do despite
his or her physical or mental limitations.  20 C.F.R.
§ 404.1545(a).  Sedentary work "involves lifting no more than 10
pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools.  Although a
sedentary job is defined as one which involves sitting, a certain
amount of walking and standing is often necessary in carrying out
job duties.  Jobs are sedentary if walking and standing are
required occasionally and other sedentary criteria are met."  20
C.F.R. § 404.1567(a).

[4]Plaintiff was 34 years old at the time of the hearing
before the ALJ.  (R. 612).

[5]On March 30, 2004, shortly after filing his application for
DIB, Plaintiff completed a Daily Activities Questionnaire,
indicating that he and his fiancé had 9 children, and
representing that he no longer had sex with his fiancé due to
back pain.  (R. 72, 78).  Despite this representation, between
the date he completed the Daily Activities Questionnaire and the
hearing before the ALJ, Plaintiff and his fiancé had 2 more
children.  (R. 620).

3

clean-up crew of a fire restoration company, a carpet cleaner, and a shipper and mover for a moving company.  (R. 64, 612-14).

In 1996, Plaintiff sustained a back injury when he fell down concrete stairs during the course of his employment.[6]  Due to continued back pain despite conservative treatment, Plaintiff underwent a laminectomy in 1997.  In 1998, Plaintiff took a job as an accounts manager, which he held until September 2002 when he alleges that he could no longer work due to pain in his low back, legs, right buttock and groin area.[7]  (R. 64, 615-16).  With respect to the manner in which back problems limit Plaintiff's ability to engage in substantial gainful activity, in a Disability Report completed on March 19, 2004, Plaintiff indicated that he can "barely walk," cannot "stand for long

---

[6]According to the Disability Report completed by Plaintiff on March 19, 2004, he was working on the clean-up crew of a fire restoration company when he sustained this back injury.  (R. 64).

[7]Plaintiff has proffered several different reasons for the termination of his employment as an accounts manager in September 2002.  In a Daily Activities Questionnaire completed by Plaintiff on March 30, 2004 in connection with his application for DIB, Plaintiff indicated that he was fired from his last job after he informed the employer he was scheduled to undergo further back surgery (which was never performed).  (R. 76).  At the hearing before the ALJ on June 21, 2006, however, Plaintiff testified that he stopped working in September 2002 because his job required a long commute, i.e., 70 miles, and his doctor "did not feel comfortable" with his ability to operate a motor vehicle safely due to the fact that he was taking narcotics to manage his back pain.  In this regard, Plaintiff testified further that it was his doctor who decided that he should stop working "more than me."  (R. 614-15).

4

ᛉ

periods," cannot "sit for long periods," cannot "lift anything,"[8] and takes "a lot of medications."  (R. 64).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's application for DIB on June 21, 2006, the ALJ initially asked the VE to classify Plaintiff's past work.  In response, the VE testified that Plaintiff's job as an accounts manager was semiskilled and light; his jobs as a carpet cleaner and a member of a cleaning crew were semiskilled and medium; and his job as a helper for a moving company was unskilled and heavy.  (R. 626-27).

The ALJ then asked the VE whether jobs existed for a hypothetical individual of Plaintiff's age, education and work experience who is limited to sedentary work that involves no repetitive bending and no operation of foot or pedal controls and that permits a sit/stand option every 10 to 20 minutes.  The VE responded affirmatively, citing the jobs of telephone solicitor (404,000 jobs nationally), telephone clerk (104,000 jobs

---

[8]Contrary to Plaintiff's representation in the Disability Report completed on March 19, 2004 regarding his lifting ability, in a Daily Activities Questionnaire completed by Plaintiff 11 days later, he indicated that he could lift 15 to 20 pounds.  (R. 74).

nationally) and ticket seller (238,000 jobs nationally).[9]   (R. 627).

## D. Medical Evidence

The medical evidence in the record pertaining to Plaintiff's back problems may be summarized as follows:[10]

On February 10, 1997, Plaintiff was admitted to Saint Vincent Health Center for a laminectomy based on the diagnosis of a herniated disc at the L4-5 level.   The surgery was performed by Elio D. DeMeira, M.D.   Regarding the history of Plaintiff's disc herniation, the hospital records indicate that Plaintiff fell at work in 1996; that he had experienced right-sided lumbar etiology since the fall; that he had failed conservative treatment; and that, as a result, he had decided to undergo surgery.   At the

---

[9]Plaintiff's counsel then asked the VE whether his response to the ALJ's hypothetical question would change if, in addition, the individual was unable to work on a full-time basis due to a physical impairment.   The VE responded affirmatively, testifying that, by definition, substantial gainful activity is full-time work, *i.e.*, 40 hours per week.   Therefore, an individual who lacked the ability to work on a full-time basis could not engage in substantial gainful activity.   (R. 628-29).   Based on his assessment of Plaintiff's RFC, which the Court concludes is supported by substantial evidence, the ALJ rejected counsel's hypothetical question and the VE's response thereto.   (R. 19-20).

[10]To provide a complete history of Plaintiff's back problems, the Court has included evidence in its summary relating to Plaintiff's treatment for back pain which pre-dates September 26, 2002, the date on which Plaintiff alleges he became disabled.

6

time of his discharge on February 12, 1997, Plaintiff's lumbar etiology had improved to a "significant degree." (R. 84-109).

Plaintiff did well following his back surgery and returned to work in 1998. However, Plaintiff's back pain returned in February 1999. (R. 120). The impression of an MRI of Plaintiff's lumbar spine on June 21, 1999 was described as subtle post-surgical changes at L4-5 and discogenic degenerative change with disc space narrowing at L1-2 and L4-5. (R. 113-15).

On July 22, 1999, Plaintiff returned to Dr. DeMeira. The notes of this office visit indicate that Plaintiff had done well following his February 1997 back surgery until February 1999 when he started experiencing back and groin pain.[11]  Dr. DeMeira noted that a review of Plaintiff's recent MRI scans revealed no clear cut nerve compression on his lumbar spine and no new disc herniation, and he did not recommend further surgical intervention. Rather, Dr. DeMeira suggested that Plaintiff discuss the possibility of epidural injections for pain

_____

[11]According to Dr. DeMeira's office notes, Plaintiff attributed the recurrence of his back pain in February 1999 to his job as a truck driver, although "no discreet accident" had precipitated his complaints of renewed pain. (R. 120). This notation conflicts with other evidence in the administrative record.  Specifically, according to the Disability Report completed by Plaintiff on March 19, 2004, he was working as an accounts manager in February 1999 when he began to experience back and groin pain and this job involved sitting at a computer. (R. 64-65).

7

management with Dr. Thomas, Plaintiff's workmen's compensation doctor. (R. 120).

On September 14, 1999, Plaintiff was evaluated by Steven A. Gilman, M.D., a neurosurgeon. During the evaluation, Plaintiff reported that he had done well following back surgery and returned to work. However, he subsequently developed pain in his back that radiated down into his right testicle.[12] Plaintiff also reported that the treatments he had been receiving from Dr. Thomas were not helpful. With respect to Plaintiff's physical examination, Dr. Gilman noted, among other things, that Plaintiff's motor strength was 5/5 in all muscle groups; that his reflexes were symmetric with downgoing toes; that his gait and station were normal; that his straight leg raise signs were negative; and that he had no tenderness to palpation in the groin on the right side. Dr. Gilman also noted that a recent MRI of Plaintiff's lumbar spine showed "what might be a slight amount of disc protrusion on the left side at L4-L5 but it is not terribly

_____

[12]According to the report of Dr. Gilman, Plaintiff indicated that his renewed back pain was attributable to repetitive dragging of 2,000 pound skids at his new job. (R. 110). Again, Plaintiff's apparent statement concerning the cause of his renewed back pain conflicts with the Disability Report he completed on March 19, 2004. As noted in footnote 11, Plaintiff was employed as an accounts manager of the time he began experiencing back pain in February 1999, and, according to the Disability Report, this job involved sitting at a computer and did not require lifting items weighing more than 15 pounds. (R. 64-65).

8

impressive." Dr. Gilman's impression was probable chronic L5

nerve root irritation, and he recommended conservative treatment.

(R. 110-11).

Another MRI of Plaintiff's lumbar spine was performed on

September 28, 2000 for possible impingement on the L5 nerve root.

The impression was described as follows:

**IMPRESSION**: LUMBAR SPINE MRI DEMONSTRATES DEGENERATIVE DISC
CHANGES L1-2, 3-4, AND 4-5, AND EVIDENCE OF PREVIOUS RIGHT
L4-5 LAMINECTOMY.  THERE IS BROAD-BASED DISC BULGE WITH MILD
MIDLINE PROTRUSION L1-2, WITHOUT NEUROLOGIC IMPACT.  THERE
IS A RIGHT NEUROFORAMINAL DISC PROTRUSION L3-4, WHICH MAY
IMPACT THE EXITING RIGHT L3 NERVE ROOT, AND FOR WHICH
CLINICAL CORRELATION IS SUGGESTED.  AT L4-5, THERE HAS BEEN
A RIGHT LAMINECTOMY.  THERE IS A RIGHT LATERAL RECESS-
NEUROFORAMINAL DISC PROTRUSION, WHICH APPROACHES BOTH THE
RIGHT L5 AS WELL AS THE RIGHT L4 NERVE ROOTS.  THERE IS
ENHANCING SCAR TISSUE SURROUNDING THE RIGHT L5 NERVE ROOT,
WITHIN THE CANAL.  NO SIGNIFICANT CONTOUR DEFORMITY UPON THE
THECAL SAC AT THIS LEVEL.  FINALLY, THERE IS RELATIVE
NARROWING OF THE LEFT LATERAL RECESS DUE TO A COMBINATION OF
DEVELOPMENTAL AS WELL AS DEGENERATIVE FACET JOINT FACTORS,
WHICH MAY IMPACT THE EXITING LEFT S1 NERVE ROOT.  NO
SIGNIFICANT CHANGE IN THE ABOVE FINDINGS SINCE 6/21/99.

(R. 116-17).

On January 22, 2001, Plaintiff returned to Dr. DeMeira. The

notes of this office visit indicate that following unsuccessful

treatments by Dr. Thomas, Plaintiff was referred to two

orthopedic surgeons for evaluation, and that both surgeons

proposed an L4-5 fusion.  Dr. DeMeira noted that Plaintiff's

physical examination revealed normal tone of the paravertebral

musculature bilaterally, preserved lumbar lordosis, normal

straight leg raise bilaterally, normal deep tendon reflexes at

9

the knees and ankles bilaterally, and normal objective motor and sensory testing. Dr. DeMeira also noted that Plaintiff walked without a limp. Dr. DeMeira's diagnosis was chronic lumbar degenerative disc disease, and he ordered additional tests for Plaintiff to rule out instability at the L4-5 level. (R. 119).

On March 9, 2001, Plaintiff presented to the Emergency Room ("ER") of Saint Vincent Health Center complaining of increasing recurrent low back pain for two days. The assessment was described as acute exacerbation of multilevel lumbar disc disease. Plaintiff was given prescriptions for Vicodin and Flexeril.[13] (R. 233-34).

On March 17, 2001, Plaintiff presented to the ER of Hamot Medical Center complaining of persistent low back pain radiating into his legs. With respect to his neurological examination, Plaintiff was able to ambulate on his heels and toes without apparent difficulty; he had minimal paravertebral muscle spasm of the lower lumbar sacral area and no tenderness over the lumbosacral spine; and he had only a slight decrease in sensation over the right lateral thigh and lateral tib-fib area. The

---

[13]Vicodin, which may be habit-forming, is a combination of Acetaminophen and Hydrocodone that is used to relieve moderate to moderately severe pain. Flexeril is a muscle relaxant that is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. See www.nlm.nih.gov/medline plus/druginfo (last visited 10/19/2007).

10

diagnosis was acute exacerbation of chronic back pain with radicular pain in the bilateral lower extremities. Lortab was prescribed to control Plaintiff's pain.[14] (R. 165-67).

On March 24, 2001, Plaintiff presented to the ER of Saint Vincent Health Center complaining of continued low back pain radiating into his legs. Plaintiff reported that the pain medication which had been prescribed on March 9, 2001 had helped him. However, he had exhausted the prescription. Plaintiff was instructed to rest, apply heat and take certain precautions with regard to his back, and he was given a new prescription for Vicodin. (R. 227-31).

On May 27, 2001, Plaintiff presented to the ER of Saint Vincent Health Center stating that he had sustained a back injury while pushing a stalled car the previous day. Plaintiff was instructed to rest and apply heat to his back, and he was given prescriptions for Vicodin and Flexeril. (R. 222-23).

On August 24, 2001, Plaintiff presented to the ER of Saint Vincent Health Center with complaints of a sore back and legs, indicating that he had fallen down stairs while moving a mattress two days earlier. X-rays of Plaintiff's lumbar spine showed normal appearance and alignment of the vertebrae, no evidence of

---

[14]Like Vicodin, Lortab is a combination of Acetaminophen and Hydrocodone that is used to relieve moderate to moderately severe pain. See www.nlm.nih.gov/ medlineplus/druginfo (last visited 10/19/2007).

11

disc narrowing, end plate sclerosis or osteophyte formation, and no evidence of congenital or vertebral body lesion. Motrin, Vicodin and Flexeril were prescribed for Plaintiff.[15] (R. 216-21).

On November 14, 2001, Plaintiff presented to the ER of Hamot Medical Center complaining of back and right elbow pain which he attributed to falling down several steps after slipping on a book. An x-ray of Plaintiff's right elbow was negative, and the impression of the x-ray of Plaintiff's lumbosacral spine was described as follows: "MILD INFERIOR END PLATE COMPRESSION DEFORMITY WITH DISC SPACE NARROWING AND MARGINAL OSTEOPHYTOSIS AT L1-2 LIKELY A RESIDUAL OF OLD INJURY. THERE IS NO ACUTE ABNORMALITY EVIDENT." Plaintiff's diagnoses were acute lumbosacral sprain/strain and a contusion of the right elbow, and

---

[15]Ibuprofen is in a class of medications called NSAIDs. It works by stopping the body's production of a substance that causes pain, fever and inflammation. Motrin is prescription ibuprofen that is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. It is also used to relieve mild to moderate pain. See www.nlm.nih. gov/medlineplus/druginfo (last visited 10/19/2007).

12

he was given prescriptions for Celebrex, Skelaxin and Lortab.[16]
(R. 158, 162).

An MRI of Plaintiff's lumbar spine was performed on March
13, 2002.  The impression was described as follows: "MODERATE TO
SEVERE DIFFUSE BULGE AT THE L1-2 LEVEL, WHICH DOES NOT CAUSE ANY
SIGNIFICANT SPINAL CANAL OR NEUROFORAMINAL NARROWING.  THERE ARE
NO OTHER SIGNIFICANT FOCAL ABNORMALITIES SEEN."  (R. 151).

James R. Steele, D.O. is Plaintiff's primary care physician.
Dr. Steele's office records indicate that he saw Plaintiff on 17
occasions between September 4, 2002 and December 23, 2002 for
complaints of back pain and pain medication refills.  (R. 407,
409-413, 415-24, 470).

Plaintiff was referred by Dr. Steele to Stephen G. Paxson,
D.O., a Board Certified physiatrist, for evaluation of his
complaints of chronic low back and leg pain.  In his report of an
examination of Plaintiff on December 23, 2002, Dr. Paxson
indicated that Plaintiff's upper and lower extremities
demonstrated good strength; that Plaintiff had some tenderness in

---

[16]Celebrex is used to relieve pain, tenderness, swelling and
stiffness caused by osteoarthritis, rheumatoid arthritis and
ankylosing spondylitis (arthritis that mainly affects the spine).
Celebrex is in a class of NSAIDs called COX-2 inhibitors.  It
works by stopping the body's production of a substance that
causes pain and inflammation.  Skelaxin, a muscle relaxant, is
used with rest, physical therapy and other measures to relax
muscles and relieve pain and discomfort caused by strains,
sprains and other muscle injuries.  See www.nlm.nih.gov/medline
plus/druginfo (last visited 10/19/2007).

13

the mid dorsal spine area; that Plaintiff's lower back had some
increased lumbar lordosis; that Plaintiff's range of motion was
diminished with respect to flexion, extension and side bending;
that, neurologically, Plaintiff was intact for motor
proprioception sensation; that Plaintiff's straight leg raise
test was negative for sciatic stretch signs; and that Plaintiff
ambulated with somewhat of a splinted spine.  Dr. Paxson
recommended that Plaintiff be evaluated by a chronic pain
management team.  (R. 490-91).

On December 29, 2002, Plaintiff presented to the ER of Saint
Vincent Health Center complaining of low back pain radiating into
his testicles as a result of shoveling snow for 3 days.  No
changes were made in Plaintiff's medications.  However, he was
advised that Vicodin is a narcotic; that Vicodin and Flexeril
cause drowsiness; and that he should not drive while taking these
medications.  (R. 205-06).

Between January 7, 2003 and January 28, 2003, Plaintiff saw
Dr. Steele on 4 occasions for complaints of back pain and pain
medication refills.  (R. 401, 403-05).  Dr. Steele counseled
Plaintiff concerning the use of pain medication during these
office visits, and, on one occasion, he declined to refill
Plaintiff's prescription for Vicodin.  (R. 403).

On February 2, 2003, Plaintiff presented to the ER of Saint
Vincent Health Center complaining of bilateral lower leg pain and

14

medication was prescribed.  (R. 202-03).  Between February 4,

2003 and June 3, 2003, Plaintiff was seen by Dr. Steele on 14

occasions for complaints of back pain and pain medication

refills.[17]  (R. 385, 387-91, 393, 395-400, 402).

Plaintiff was evaluated by Jonathan A. Borden, M.D., a

neurosurgeon, on June 9, 2003.  Dr. Borden noted that the March

2002 MRI of Plaintiff's lumbar spine showed a disc bulge at the

L1-2 level without significant spinal canal or neuroforaminal

narrowing and no recurrent herniation at L4-5.  Dr. Borden

indicated that Plaintiff has "failed back syndrome;" that he

could not predict whether Plaintiff would benefit from a fusion

at L4-5; that he personally did not perform fusions unless there

was "clear cut evidence of spinal instability;" and that

Plaintiff lacked such evidence.  In sum, Dr. Borden opined that

further surgery was unlikely to help Plaintiff.  (R. 148-49,

596).

Between June 10, 2003 and August 25, 2003, Plaintiff was

seen by Dr. Steele on 15 occasions for complaints of back pain

and pain medication refills.  (R. 371-72, 374-84, 386).  On

September 1, 2003, Plaintiff presented to the ER of Saint Vincent

---

[17]During the February 10, 2003 office visit with Dr. Steele,
Plaintiff indicated that he needed refills of his pain medication
because he was going out of town for 10 days.  (R. 399).  During
the April 2, 2003 office visit with Dr. Steele, Plaintiff
declined the doctor's offer of a referral to a pain management
specialist.  (R. 395).

15

Health Center complaining of pain in his abdomen and left
testicle.  Plaintiff reported that he had been thrown over the
handle bars of a bicycle a week earlier.  Vicodin was prescribed
for Plaintiff, and he was instructed to follow-up with his family
physician.  (R. 182-83).

Between September 2, 2003 and January 5, 2004, Plaintiff was
seen by Dr. Steele on 16 occasions for complaints of back pain
and pain medication refills.  (R. 354-55, 357-69).  Another MRI
of Plaintiff's lumbar spine was performed on January 6, 2004.
The impression was described as "Degenerative disc disease L1-2,
right lateral recess stenosis L4-5."  (R. 150).  On January 15,
2004, Plaintiff was seen by Dr. Steele for complaints of back
pain and a refill of his pain medication.  (R. 352).

On January 23, 2004, Plaintiff presented to the ER of Saint
Vincent Health Center complaining of low back pain.  Plaintiff
indicated that he could not see his family physician that day and
he needed a refill of his pain medication.  The ER physician
informed Plaintiff that he would not prescribe Oxycodone for
him.[18]  He did, however, prescribe Lortab and instructed
Plaintiff to follow-up with his family physician.  (R. 179-80).

---

[18]Oxycodone, which can be habit-forming, is used to relieve
moderate to moderate-to-severe pain.  See www.nlm.nih.gov/
medlineplus/druginfo (last visited 10/19/2007).

Between February 4, 2004 and February 19, 2004, Plaintiff was seen by Dr. Steele on 3 occasions for complaints of back pain and pain medication refills. (R. 247-49). Plaintiff was referred by Dr. Steele to Mohamed A. Kourtu, M.D. for an evaluation of his back pain, which was performed on February 23, 2004. Dr. Kourtu noted that Plaintiff's chief complaint was chronic low back pain radiating into the lower extremities with associated numbness in the toes of the right foot. Following his examination of Plaintiff, Dr. Kourtu described his impression as "Post laminectomy, failed back syndrome with lumbar radiculopathy." Dr. Kourtu's plan for Plaintiff included an epidural steroid injection at the L4-5 level and a trial of Neurontin for neuropathic pain due to compressed nerve roots.[19] In addition, Dr. Kourtu recommended that Plaintiff be referred to a neurosurgeon for evaluation. (R. 459-61).

Between February 26, 2004 and March 15, 2004, Plaintiff was seen by Dr. Steele on 4 occasions for complaints of back pain and pain medication refills. (R. 337, 341-44). During the March 11, 2004 office visit, Dr. Steele performed a comprehensive physical examination of Plaintiff. With respect to Plaintiff's

---

[19]Neurontin is used to help control certain types of seizures in patients who have epilepsy. It is also used to relieve the pain of postherpetic neuralgia (the burning, stabbing pain or aches that may last for months or years after an attack of shingles). See www.nlm.nih.gov/medlineplus/druginfo (last visited 10/19/2007).

17

extremities, Dr. Steele noted that there was no clubbing, swelling, edema, deformities or limitation in his range of motion.  As to Plaintiff's back, Dr. Steele noted that there was no abnormal curvature, no pain or tenderness and no limitation of motion, and Plaintiff's straight leg raise test was negative.  Finally, regarding Plaintiff's neurological examination, Dr. Steele noted that Plaintiff demonstrated no weakness or paralysis, and that his deep tendon reflexes, sensory exam and gait were normal.  (R. 341-42).

On March 21, 2004, Plaintiff presented to the ER of Saint Vincent Health Center complaining of back and leg pain.  Plaintiff's neurological examination revealed no leg weakness or numbness, no sacroliac joint tenderness, no pain on straight leg raise test, no pain on hip flexion/rotation, normal motor strength and no sensory deficit.  Plaintiff's diagnoses were chronic back pain and narcotic abuse.  No medication was prescribed for Plaintiff and he was referred for evaluation for drug rehabilitation.  (R. 176-77).  The next day, March 22, 2004, Plaintiff presented to Dr. Steele complaining of back pain and requesting a refill of his pain medication.  It does not appear from the notes of this office visit that Dr. Steele complied with Plaintiff's request for a refill of pain medication.  (R. 338).

Between April 5, 2004 and June 10, 2004, Plaintiff was seen by Dr. Steele on 6 occasions for complaints of back pain and pain

18

medication refills. (R. 322-23, 325, 328-29, 333). On July 1, 2004, Plaintiff was treated at Hamot Medical Center for complaints of back and leg pain. Based on a physical examination, as well as the results of Plaintiff's January 6, 2004 MRI which showed a disc bulge at L4-5, physical therapy was prescribed for Plaintiff. (R. 152-53, 156-57). Between July 6, 2004 and November 1, 2004, Plaintiff was seen by Dr. Steele on 9 occasions for complaints of back pain and pain medication refills. (R. 304, 307-08, 310-11, 314, 316-18). In November 2004, Plaintiff was referred to a drug rehabilitation program for narcotic abuse. (R. 530).

Another MRI of Plaintiff's lumbar spine was performed on March 1, 2005. The MRI report indicates that there was no evidence of radiculitis, arachnoiditis or abnormal nerve root impingement. The impression was described as follows: "Upper lumbar degenerative disc disease, unremarkable postoperative evaluation of the lumbar spine at L4-5." (R. 518). During visits with Dr. Steele for back pain on March 7, 2005 and March 21, 2005, Plaintiff reported that he was doing well with respect to drug rehabilitation, and he requested refills of his non-narcotic pain medication. (R. 296, 298).

On March 24, 2005, Plaintiff was evaluated by Matt El-Kadi, M.D., a neurosurgeon. With respect to Plaintiff's physical examination, Dr. El-Kadi noted that palpation of the lumbar spine

19

produced some tenderness; that motor strength testing of the
lower extremities revealed no motor deficit; and that sensation
testing demonstrated decreased sensation of the right medial
shin.   Dr. El-Kadi also noted that an MRI of Plaintiff's lumbar
spine in March 2005 showed postoperative changes at the right L4-
5 level, lumbar spondylosis and no significant spinal stenosis.
Dr. El-Kadi opined that surgery was not warranted, and he
recommended physical therapy.   In the event physical therapy did
not provide relief to Plaintiff, he suggested the next step would
be referral to a pain management clinic.   Dr. El-Kadi prescribed
the following medications for Plaintiff: Vicodin for pain, Motrin
for inflammation and Flexeril for spasm.   (R. 282-85).

    Plaintiff was seen by Dr. Steele on April 18, 2005 for his
back pain.   At that time, Plaintiff reported that he needed no
further treatment with regard to drug rehabilitation.   He also
reported that his pain status was unchanged.   Dr. Steele noted
that the only medication taken by Plaintiff to alleviate his pain
at that time was Neurontin.   (R. 297).

    Plaintiff was referred to Richard C. Mendel, M.D., a
neurosurgeon, for evaluation of his low back pain, and the
evaluation was performed on May 24, 2005.   Plaintiff informed Dr.
Mendel that he spent his days caring for his fiancé and children.
Dr. Mendel noted that Plaintiff was significantly overweight and
complained "bitterly" of weakness in his legs, especially the

20

right leg.  Plaintiff's second complaint in order of severity was low back pain.  With respect to Plaintiff's physical examination, Dr. Mendel noted that Plaintiff's straight leg raise test was negative; that Plaintiff was able to bend forward and backwards "without too much difficulty;" and that Plaintiff was able to dorsi and plantar flex 5 repetitions on each side without difficulty.  Based on his review of the recent MRI of Plaintiff's lumbar spine, Dr. Mendel noted: "It is quite surprising to see a 33 year old this disabled from back pain with an MRI that shows degenerative changes.  Certainly this is someone who demands conservative therapy."  Dr. Mendel opined that surgical intervention at that time would be "quite adventuresome," and that if plain lumbar spine films ruled out instability, physical therapy may be beneficial.  (R. 286-87, 597).

Following Plaintiff's office visit with Dr. Steele on June 7, 2005 for continued complaints of back pain, the doctor described Plaintiff's back problem as "neuropathic pain syndrome," noting that Plaintiff was taking Ibuprofen and Neurontin to control his pain.  (R. 295).  The last office notes of Dr. Steele in the record are dated December 19, 2005.  The notes indicate that Plaintiff was seen for a follow-up of his back pain, and that he was clinically unchanged.  (R. 288).

Another MRI of Plaintiff's lumbar spine was performed on April 11, 2006.  The impression was described as follows: "1.

21

SLENDER SIZE OF THE SPINAL CANAL DEVELOPMENTALLY. 2. RIGHT
SUBARTICULAR AND FORAMINAL DISK PROTRUSION L4-5. FACET
ARTHROPATHY L4-5. POTENTIAL FOR RIGHT RADICULOPATHY. 3.
DEGENERATIVE DISK DISEASE L1-2, L3-4." (R. 593). The report of
x-rays of Plaintiff's lumbar spine which were taken on the same
day indicates, among other things, that "[f]lexion and extension
imaging demonstrated relative radiographic stability of the
vertebral segments." The impression of the x-rays was described
as follows: "MODERATE DEGENERATIVE DISK SPACE NARROWING L1-L2
WITH QUESTIONABLE MINIMAL REMOTE COMPRESSION DEFORMITY OF L1."
(R. 595).

Plaintiff was referred to Daniel J. Muccio, M.D., a
neurosurgeon, for evaluation of his lumbar disc degeneration, and
the evaluation was performed on June 15, 2006, approximately one
week prior to the hearing before the ALJ. Based on his
neurologic examination of Plaintiff, as well as the recent MRI
and x-rays of Plaintiff's lumbar spine, Dr. Muccio described his
findings and recommendation as follows:

IMPRESSION: It is my impression that the patient presents
with chronic intractable back and lower extremity pain. His
MRI scan reveals some disc degeneration. It does not reveal
surgically significant residual or recurrent nerve root
compression.

PLAN: I did not recommend consideration of surgery to him.
I discussed the limitations of both interbody fusion surgery
and the artificial disc in a case such as his. I

22

recommended weight reduction, the development of a core
strengthening program and a trial of chiropractic care....[20]

(R. 601-03).

### III.   Legal Analysis

#### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g), which provides that an individual may obtain judicial
review of any final decision of the Commissioner by bringing a
civil action in the district court of the United States for the
judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."   Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance.   Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979).   Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence.   Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

---

[20]With respect to Dr. Muccio's recommendation that Plaintiff
lose weight, the doctor's report indicates that Plaintiff is 6'2"
tall and weighed 300 pounds at that time.   (R. 601).

## B.   The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months. 42 U.S.C.
§ 423(d)(1). A claimant is considered unable to engage in any
substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

                    *    *    *

    In Plummer, we recounted the five step sequential
    evaluation for determining whether a claimant is under a
    disability, as set forth in 20 C.F.R. § 404.1520:

        In step one, the Commissioner must determine
        whether the claimant is currently engaging in
        substantial gainful activity. 20 C.F.R. § 404.1520(a).
        If a claimant is found to be engaged in substantial
        gainful activity, the disability claim will be denied.
        Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,

                            24

2290-91, 96 L.Ed.2d 119 (1987). In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment. 20 C.F.R.
§ 404.1520(c). If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work. 20 C.F.R. § 404.1520(d). If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five. Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work. 20 C.F.R.
§ 404.1520(d). The claimant bears the burden of
demonstrating an inability to return to her past
relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step. At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability. 20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity. The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

*    *    *

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in Plaintiff's favor: that is, the ALJ found

25

that Plaintiff had not engaged in substantial gainful activity
since his alleged onset date of disability, and the medical
evidence established that Plaintiff suffers from degenerative
disc disease, which is a severe impairment.[21]  (R. 14).  Turning
to step three, the ALJ found that Plaintiff's impairment was not
sufficiently severe to meet or equal the requirements of Listing
1.00 set forth in 20 C.F.R., Pt. 404, Subpt. P, App. 1, relating
to the musculoskeletal system.  (R. 14-15).  As to step four, the
ALJ found that Plaintiff is unable to perform any of his past
relevant work due to the exertion levels of those jobs.  (R. 18).
Finally, regarding step five, based on the testimony of the VE,
the ALJ found that considering Plaintiff's age, education, past
work experience and RFC, there are a significant number of
sedentary jobs in the national economy which Plaintiff could
perform, including the jobs of a telephone solicitor, a telephone
clerk and a ticket seller.  (R. 19).

## C. Discussion

Plaintiff raises two arguments in support of his motion for
summary judgment which the Court will address individually.

i

As noted previously, at step three of the sequential
evaluation process, an ALJ must determine whether a claimant's

---

[21]The ALJ also noted that Plaintiff is status post
laminectomy.  (R. 14).

26

.        .

impairment or combination of impairments meets or medically

equals a listing set forth in 20 C.F.R., Pt. 404, Subpt. P, App.

1, which are descriptions of physical and mental illnesses and

abnormalities.  If a claimant's impairment is listed in Appendix

1 or is equal to a listed impairment, he is presumed to be

disabled without considering age, education or work experience.

20 C.F.R. § 404.1520(d).  "For a claimant to show that his

impairment matches a listing, it must meet *all* of the specified

medical criteria.  An impairment that manifests only some of

those criteria, no matter how severely, does not qualify."

Sullivan v. Zebley, 493 U.S. 521, 530 (1989)(Emphasis in

original).

     Plaintiff argues that the ALJ erred by failing to find that

his degenerative disc disease meets the requirements of Listing

1.04A in Appendix 1, which provides:

>              1.01 Category of Impairments,
>                   Musculoskeletal
>
>                    *    *    *
>
>     1.04 Disorders of the spine (e.g., herniated nucleus
> pulposis, spinal arachnoiditis, spinal stenosis,
> osteoarthritis, degenerative disc disease, facet arthritis,
> vertebral fracture), resulting in compromise of a nerve root
> (including the cauda equina) or the spinal cord.  With:
>
>     A. Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of
> the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine);...

27

*   *   *

In support of this argument, Plaintiff relies on the reports of
the MRIs of his lumbar spine which were performed on March 13,
2002, January 6, 2004, March 1, 2005 and April 11, 2006 (R. 150-
51, 518, 593), as well as the consultative report of Dr. El-Kadi
dated March 24, 2005 and the consultative report of Dr. Muccio
dated June 15, 2006 (R. 283-84, 601-03).  After consideration,
the Court concludes that Plaintiff's listing argument is
meritless.  The ALJ's finding that Plaintiff does not meet the
requirements of any listed impairment in Section 1.00 of Appendix
1, relating to the musculoskeletal system, is supported by
substantial evidence.

Initially, the Court notes that the MRIs of Plaintiff's
lumbar spine do not constitute definitive evidence of nerve root
compression which is required to satisfy Listing 1.04A of
Appendix 1.  As noted by the ALJ, the March 13, 2002 MRI showed a
disc bulge at the L1-2 level without significant spinal canal or
neuroforaminal narrowing (R. 15); the January 6, 2004 MRI showed
degenerative disc disease at the L1-2 level without significant
disc bulge or herniation[22] (R. 15); the March 1, 2005 MRI showed

_____

[22]Although not mentioned by the ALJ in his decision, the
report of the January 6, 2004 MRI states that a protruding disc
at the L4-5 level of Plaintiff's lumbar spine *may* impinge upon
the L4 nerve root and *could* create an L4 radiculopathy.  (R.
150).  The report does not state definitively that there is nerve
root compression at this level, however, and there is evidence to
the contrary.

postoperative changes at the L4-5 level but no significant spinal stenosis[23] (R. 16); and Dr. Muccio, a neurosurgeon, interpreted the April 11, 2006 MRI as showing no nerve root compression at either the L1-2 level or the L4-5 level of Plaintiff's lumbar spine (R. 17).

In any event, even if the medical evidence in this case established definitive nerve root compression, in order to meet the requirements of Listing 1.04A of Appendix 1, Plaintiff also must produce medical evidence establishing "motor loss ... accompanied by sensory or reflex loss and, ... positive straight-leg raise test," and there is substantial evidence to support the ALJ's determination that such evidence is lacking. Specifically, the ALJ noted that (a) Dr. Paxson's examination of Plaintiff in December 2002 revealed good strength in Plaintiff's upper and lower extremities proximally and distally, intact motor sensation and negative straight leg raise test (R. 15-16); (b) strength testing of Plaintiff's lower extremities by Dr. El-Kadi in March 2005 showed no motor deficit (R. 16); (c) during Plaintiff's examination by Dr. Mendel in May 2005, his straight leg raise test was negative, he was able to bend forward and backward without much difficulty, and he was able to dorsi and plantar

---

[23]In fact, the report of the March 1, 2005 MRI of Plaintiff's lumbar spine specifically states that there was no evidence of radiculitis or arachnoiditis and no evidence of abnormal nerve root impingement or displacement.  (R. 518).

flex 5 repetitions on each side without difficulty (R. 16); and
(d) during his examination by Dr. Muccio in June 2006, Plaintiff
demonstrated negative seated knee extension for radicular pain,
his lower extremity strength was 5/5, his deep tendon reflexes
were symmetrical and his gait and stance were normal[24] (R. 17).
Based on the foregoing, Plaintiff's first argument in support of
summary judgment is unavailing.

## ii

As noted previously, the ALJ found that Plaintiff retained
the RFC to perform work at the sedentary level with the following
limitations: (1) Plaintiff must be allowed to alternate between
sitting and standing every 10 to 20 minutes; (2) Plaintiff cannot
engage in repetitive bending; and (3) Plaintiff cannot use foot
and pedal controls. Based on this RFC assessment and Social
Security Ruling 83-12 ("SSR 83-12"),[25] Plaintiff asserts that the

---

[24]In his decision, the ALJ also states that when Dr. Steele
examined Plaintiff in June 2004, he demonstrated full range of
motion in his upper and lower extremities and normal deep tendon
reflexes. (R. 16). The Court is unable to locate in the record
the evidence supporting this statement by the ALJ. However, the
Court notes that during Plaintiff's comprehensive physical
examination by Dr. Steele in March 2004, the doctor noted that
Plaintiff's straight leg raise test was negative, he had no
limitation of motion, and he had no weakness or paralysis, normal
deep tendon reflexes and a normal gait. (R. 341).

[25]Social Security Rulings are agency rulings published "under
the authority of the Commissioner of Social Security" and "are
binding on all components of the Social Security Administration."
Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000).

30

ALJ erred in finding that he could engage in substantial gainful

activity.  After consideration, the Court concludes that

substantial evidence supports the ALJ's adverse decision in this

case.  Accordingly, Plaintiff's second argument in support of

summary judgment also is unavailing.

Plaintiff maintains that the ALJ did not comply with SSR 83-

12 in determining that he could perform substantial gainful

activity in two respects.  First, Plaintiff contends that the ALJ

did not adequately take into consideration his need to alternate

between sitting and standing every 10 to 20 minutes in accordance

with SSR 83-12, which provides in relevant part:

SPECIAL SITUATIONS

1. *Alternate Sitting and Standing*

\*    \*    \*

There are some jobs in the national economy - typically
professional and managerial ones - in which a person can sit
or stand with a degree of choice.  If an individual had such
a job and is still capable of performing it, or is capable
of transferring work skills to such jobs, he or she would
not be found disabled.  However, most jobs have ongoing work
processes which demand that a worker be in a certain place
or posture for at least a certain length of time to
accomplish a certain task.  Unskilled types of jobs are
particularly structured so that a person cannot ordinarily
sit or stand at will.  In cases of unusual limitation of
ability to sit or stand, a [Vocational Specialist] should be
consulted to clarify the implications for the occupational
base.

Second, Plaintiff contends that the ALJ erred by failing to

elicit testimony from the VE regarding the number of jobs

31

available in his "area of residence" in accordance with the
following provision of SSR 83-12:

> A [Vocational Specialist] can assess the effect of any
> limitations on the range of work at issue (e.g., the
> potential occupational base); advise whether the impaired
> person's RFC permits him or her to perform substantial
> numbers of occupations within the range of work at issue;
> identify jobs which are within the RFC, if they exist; and
> provide a statement of the incidence of such jobs in the
> region in which the person lives **or** in several regions of
> the country.  (Emphasis added).

With respect to Plaintiff's sit/stand option argument, a
review of the record in this case reveals that the ALJ did
precisely what SSR 83-12 requires when an ALJ is presented with a
claimant who has an unusual limitation in his ability to sit;
that is, the ALJ obtained the testimony of a VE concerning the
availability of jobs for a person with this type of limitation.
As to Plaintiff's argument regarding the failure of the ALJ to
elicit testimony from the VE concerning the number of jobs
available in his "area of residence," such testimony is not
required by SSR 83-12.  In addition to VE testimony regarding the
availability of jobs in the region in which the claimant lives,
SSR 83-12 provides that an ALJ may elicit VE testimony concerning
the availability of jobs in several regions of the country, *i.e.*,
nationally, and the VE in the present case provided such
testimony.  Specifically, the VE testified that there were
404,000 telephone solicitor jobs nationally which Plaintiff could
perform, 104,000 telephone clerk jobs nationally which Plaintiff

32

could perform, and 238,000 ticket seller jobs nationally which
Plaintiff could perform.[26]

## IV.

In sum, based on a careful review of the entire
administrative record in this case, the Court concludes that the
ALJ's decision is supported by substantial evidence.
Accordingly, the Commissioner is entitled to judgment as a matter
of law.

*William L. Standish*

William L. Standish
United States District Judge

Date: October  22 , 2007

---

[26]In this connection, the Court notes that the Social
Security Regulations specifically provide that it does not matter
whether work exists in the immediate area in which a claimant
lives.   Work exists in the national economy when there is a
significant number of jobs (in one or more occupations) having
requirements which a claimant is able to meet with his physical
or mental abilities and vocational qualities.   See 20 C.F.R.
§ 404.1566(a) and (b).